AO 91 (Rev. 11/82)

# CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br>DAVID HANS ARNTSON | DOCKET NO.<br><br>MAGISTRATE'S CASE NO.<br>**16-0115M** |

Complaint for violation of Title 18, United States Code, Section 342 (operating an air common carrier while under the influence of alcohol)

| NAME OF MAGISTRATE JUDGE<br>HONORABLE JEAN P. ROSENBLUTH | UNITED STATES MAGISTRATE JUDGE | LOCATION<br>Los Angeles, California |
|---|---|---|
| DATE OF OFFENSE<br>June 20, 2014 | PLACE OF OFFENSE<br>Orange County | ADDRESS OF ACCUSED (IF KNOWN) |

FILED
CLERK, U.S. DISTRICT COURT
JAN 19 2016
CENTRAL DISTRICT OF CALIFORNIA
BY               DEPUTY

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

[18 U.S.C. § 342]

On or about June 20, 2014, in Orange County, within the Central District of California, and elsewhere, defendant DAVID HANS ARNTSON, a commercial airline captain, knowingly operated an air common carrier, while under the influence of alcohol. Specifically, on or about June 20, 2014, defendant ARNTSON piloted a commercial airliner from Portland International Airport in Portland, Oregon, to John Wayne Airport in Orange County, California, while under the influence of alcohol.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint.)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>**ASHLEY STRICKLAND**  /S/ |
|---|---|
| | OFFICIAL TITLE<br>Special Agent, U.S. Dept. of Transportation, Office of Inspector General |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE<sup>(1)</sup><br>JEAN P. ROSENBLUTH | DATE<br>January 19, 2016 |
|---|---|

<sup>(1)</sup> See Federal Rules of Criminal Procedure 3 and 54

AUSA Dennis Mitchell, x2484     REC: bond

## AFFIDAVIT

I, Ashley Strickland, being duly sworn, declare and state as follows:

### I. INTRODUCTION

1. I am a Special Agent ("SA") with the United States Department of Transportation, Office of Inspector General ("DOT-OIG"), and am assigned to the Cerritos office of DOT OIG. I have been employed as a Special Agent for DOT-OIG since 2006. During my employment with DOT-OIG, I have conducted and participated in numerous investigations pertaining to violations of federal transportation laws. Prior to becoming a DOT-OIG SA, I worked as an investigator and as a Complaint Center Specialist for DOT-OIG.

### II. PURPOSE OF AFFIDAVIT

2. This affidavit is made in support of an arrest warrant and criminal complaint charging DAVID HANS ARNTSON ("ARNTSON") with operating an air common carrier on or about June 20, 2014, while under the influence of alcohol, in violation of Title 18, United States Code, Section 342.

3. The facts set forth in this affidavit are based upon my personal observations, my training and experience, my review of reports, information obtained from witness interviews, and/or information obtained from law enforcement personnel. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and arrest warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated

otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III. APPLICABLE LAW

4.  Federal law provides criminal sanctions for any person who operates or directs the operation of a common carrier while under the influence of alcohol or any controlled substance. See 18 U.S.C. § 342. The term, "common carrier," includes an air common carrier. See 18 U.S.C. § 341. In addition, an individual with a blood alcohol content of .10 percent or more is presumed to be under the influence of alcohol. See 18 U.S.C. § 343.

### IV. STATEMENT OF PROBABLE CAUSE

5.  According to a Federal Aviation Administration ("FAA") report, on August 16, 1982, ARNTSON was hired by Alaska Airlines (also referred to as "the company") as a pilot (First Officer) and was also placed in the company's random testing pool. According to that report, on October 1, 1987, the company promoted ARNTSON to the position of Captain. The FAA report also indicated the following, among other things:

   a.  On June 20, 2014, ARNTSON piloted Alaska Airlines flight number 580 from Portland, Oregon, to John Wayne Airport in Santa Ana, California. Earlier that day, ARNTSON had piloted Alaska Airlines flight number 573 from San Diego International Airport to Portland, Oregon.

   b.  After the arrival on June 20, 2014 of flight 580 at John Wayne Airport, a Collector/Breath Alcohol Technician for

Alaska Airlines ("the Collector"), entered the jet bridge and boarded the aircraft. The Collector told ARNTSON that he needed to speak with him. The Collector then waited for ARNTSON in the jet bridge area by the aircraft main cabin door as passengers exited the aircraft.

    c. As ARNTSON exited the aircraft onto the jet bridge, the Collector approached ARNTSON and confirmed that the man he was speaking with was ARNTSON. The Collector then informed ARNTSON that he had been selected for random drug and alcohol testing. ARNTSON acknowledged the testing notification by signing an Alaska Airlines Random Test Notification form. The Collector then escorted ARNTSON to the Family Restroom located in Terminal B located outside the TSA Security checkpoint for Gates 1 through 8 at John Wayne Airport. The Collector then escorted ARNTSON into the restroom and secured the entrance door.

    d. Inside the restroom, the Collector conducted the alcohol test with an evidential breath testing device ("EBT"). The result of the EBT test indicated a breath alcohol concentration of 0.134 percent. The Collector then explained to ARNTSON that there would be a 15-minute waiting period.

    e. During the 15-minute waiting period, ARNTSON indicated to the Collector that he needed to use the restroom. The Collector then prepared the restroom for ARNTSON's random drug test collection, which was conducted without incident. The Collector also indicated that he did not smell the odor of alcohol coming from ARNTSON during the testing process.

3

  f. After the 15-minute waiting period, the Collector conducted a confirmation EBT test, the result of which indicated that ARNTSON had a breath alcohol concentration of 0.142 percent (hereafter referred to as "the confirmation test result"). ARNTSON indicated that he did not understand why he tested positive. ARNTSON also stated that he recently got out of the hospital and was taking antibiotics.

  g. The Collector instructed ARNTSON that he could not perform safety-sensitive duties or drive a vehicle. ARNTSON acknowledged that he understood the instruction, left the restroom, and proceeded into the airport terminal.

  h. The Collector subsequently contacted the Collector Supervisor and Compliance Manager for Alaska Airlines and notified them of ARNTSON's confirmation test result.

  i. On June 20, 2014, Alaska Airlines removed ARNTSON from all safety-sensitive duties.

  6. From my review of the FAA report, including its attachments, I am informed that the EBT device used by the Collector on ARNTSON was a Lifeloc Technologies Phoenix 6.0. On December 9, 2015, I telephoned Lifeloc Technologies and spoke with Amy Evans, who identified herself as the Director of Work Place and Training Business. I also spoke with Ms. Evans by phone on December 11, 2015. From speaking with Ms. Evans, I am informed that the EBT device used to test the alcohol concentration on ARNTSON would analyze ARNTSON's breath and then, based on that analysis and application of a particular formula, the EBT device would indicate ARNTSON's <u>blood</u> alcohol

concentration. Therefore, while the narrative in the FAA report stated that ARNTSON's "breath" alcohol concentrations were .134 percent and .142 percent, the EBT used to test ARNTSON indicated blood, not breath, alcohol concentrations of .134 percent and .142 percent.

### A. Interview of First Officer

7. On June 9, 2015, Charles Jaramillo ("Jaramillo"), who acted as the First Officer and ARNTSON'S co-pilot on a flight on June 19, 2014, and on flight numbers 573 and 580 on June 20, 2014, was interviewed by me and DOT-OIG SA Brendan Culley. During the course of that interview, Jaramillo informed me of the following, among other things:

    a. Jaramillo had flown approximately five trips with ARNTSON.

    b. Jaramillo did not really know ARNTSON and did not spend time with him outside of work.

    c. Jaramillo was ARNTSON's co-pilot for a flight to San Diego on June 19, which was a layover, and then for both flights on June 20, 2014.

    d. During the layover, Jaramillo stayed at his home on June 19, 2014; consequently, he was not aware of what ARNTSON did during the evening of June 19, 2014.

    e. With respect to the flights on June 20, 2014, there was nothing odd about those flights. The layover in Portland was short, maybe a couple of hours, and during that time, Jaramillo went to a Starbucks and later met ARNTSON at the plane that ARNTSON would fly from Portland to Orange County.

  f. While Jaramillo suspected that he (Jaramillo) left the cockpit during the flights on June 20 to stretch his legs, he could not recall whether ARNTSON did so.

  g. Jaramillo believed that the flight crew brought him and ARNTSON breakfast in the cockpit during the first flight of the day, but he could not be entirely sure.

  h. A lot of the pilots bring their own food and drink on board, but Jaramillo could not recall if ARNTSON had a beverage in the cockpit.

  i. ARNTSON never talked to Jaramillo about being intoxicated.

  j. Upon arriving at John Wayne Airport, crew members for the next flight were waiting at the gate. When their plane pulled into the gate, the drug tester was also waiting along with the next flight crew. Jaramillo recalled that ARNTSON, apparently upon seeing the drug tester at the gate, said, "I bet it's for me."

  B. Interview of ARNTSON

  8. On October 20, 2015, I and DOT-OIG SA Brendan Culley interviewed ARNTSON at his home in Newport Beach. After we identified ourselves, ARNTSON agreed to speak with us. ARNTSON indicated the following, among other things:

  a. When ARNTSON underwent the testing procedure, the tester did not tell him the test results, and ARNTSON did not know he had tested positive for alcohol until he got a call from Alaska Airlines' Chief Pilot in Orange County.

   b. ARNTSON could not explain why his breathalyzer results were positive. Upon being informed of the test results by the Chief Pilot, he told the Chief Pilot that he did not know how it was possible because he had not had anything to drink. In response, the Chief Pilot told him to get his blood tested.

   c. ARNTSON then attempted to get his blood tested at several urgent care facilities, but he was told that he had to have a prescription. He ultimately got his blood tested the following morning at an emergency room around 6:30 a.m., and that test result showed 0.0 for blood alcohol level.

   d. ARNTSON cannot explain the reason for his positive results. On June 5, 2014, during a flight, he had a severe nose bleed. He went to an emergency room on June 5 and then again on June 6 and was not released from the hospital until June 9, 2014. While at the hospital, he underwent a procedure to help with the nose bleed.

   e. ARNTSON was not taking any medication that could have resulted in the positive test result.

   f. ARNTSON was in Phoenix or Tucson before being in Orange County. Later, however, ARNTSON indicated that he could have been in San Diego.

   g. The night before the flight, ARNTSON stayed at the crew hotel which he believed was a Hilton on the waterfront in San Diego. He and the first officer, whose name he could not recall, went to the hotel restaurant for dinner the night before the flight. ARNTSON ordered a beer but only took a few sips of it.

      h.    ARNTSON is a social drinker and has never had any issues with alcohol or substance abuse.

      i.    ARNTSON retired from Alaska Airlines after the June 20, 2014 trip, and his retirement was due to medical issues.

    C.    **Interviews of Flight Crew Members**

    9.    I have conducted telephonic interviews of two flight crew members who were on Alaska Airlines flight number 580 on June 20, 2014. Each of those flight crew members indicated that he or she did not see ARNTSON consume alcohol, and that he or she did not smell alcohol on ARNTSON during the flight.

    10.    I have also conducted telephonic interviews of two flight attendants who were on Alaska Airlines flight number 573 on June 20, 2014 (which flight was piloted by ARNTSON before flight number 580). Both of those flight attendants indicated that they had not seen ARNTSON consume alcohol, and that they had not smelled alcohol on ARNTSON. However, one of those flight attendants, when asked if he recognized the pilots' names, stated that he did not and realized that he was thinking about a different flight because he thought that the first officer was a female. In addition, the other flight attendant indicated that he was not close enough to the pilots - so that he could really not answer other than to say, "not applicable."

## V. CONCLUSION

    11.    Based on the foregoing facts, I believe there is probable cause to issue an arrest warrant and criminal complaint charging DAVID HANS ARNTSON with operating an air common carrier

on or about June 20, 2014, while under the influence of alcohol, in violation of Title 18, United States Code, Section 342.

/S/
_____
Ashley Strickland, Special
Agent, United States
Department of Transportation,
Office of Inspector General

Subscribed to and sworn before me this 19th day of January, 2016.

**JEAN P. ROSENBLUTH**
_____
HONORABLE
UNITED STATES MAGISTRATE JUDGE